**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

SRISDI KIDKARNDEE,

                       Plaintiff,

          v.                                  No. 12-CV-502
                                              (GTS/CFH)

CARL J. KOENIGSMANN, Chief Medical
Director, DOCCS; M.D. PANG KOOI,
Facility Health Services Director, Auburn
Correctional Facility; NANCY RYERSON,
Nurse Practitioner, Auburn Correctional
Facility,

                      Defendants.

_____

**APPEARANCES:**                        **OF COUNSEL:**

SRISDI KIDKARNDEE
Plaintiff Pro Se
05-A-3510
Auburn Correctional Facility
Post Office Box 618
Auburn, New York 13021


HON. ERIC T. SCHNEIDERMAN        KEVIN P. HICKEY, ESQ.
Attorney General for the              Assistant Attorney General
  State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

            **REPORT-RECOMMENDATION AND ORDER**[1]

_____

      [1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Plaintiff pro se Srisdi Kidkarndee ("Kidkarndee"), an inmate currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, three DOCCS medical personnel, violated his constitutional rights under the Eighth Amendment. Compl. (Dkt. No. 1).[2] Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. Dkt. No. 32. Kidkarndee opposes this motion. Dkt. No. 39. Defendants filed a reply. Dkt. No. 40. For the following reasons, it is recommended that defendants' motion be granted.

## I. Background

The facts are related in the light most favorable to Kidkarndee as the non-moving party.[3] See subsection II(A) infra. At all relevant times, Kidkarndee was incarcerated at

_____

[2] Kidkarndee testified that "Inmate O" had drafted this complaint as well as several grievances on behalf of Kidkarndee because Kidkarndee's English is poor. Kidkarndee Dep. (Dkt. No. 32-6) at 41:6–43:1. While "Inmate O" does not speak Thai, Kidkarndee testified that "Inmate O" understood some of his English and ailments. Id. at 41:22–23. Federal courts have recognized pro se inmate complaints that are drafted with other inmates' assistance. Levan v. Thomas, No. CV-10-2278-PHX-GMS (LOA), 2011 WL 285843, at *2 n.2 (D. Ariz. Jan. 27, 2011); Soto v. Olukunle Obadina, No. 10-CV-260-MJR, 2010 WL 4103354, at *1 (S.D. Ill. Oct. 18, 2010) (all unpublished opinions are attached to this Report-Recommendation as exhibits).

[3] In his response to defendants' motion, Kidkarndee asserts that his deposition testimony should be stricken because the Thai interpreter employed for the deposition failed to provide responsive answers to defendants' questions. Kidkarndee Resp. (Dkt. No. 39) at 5. Kidkarndee does not point to specific deposition statements that are unresponsive. Conversely, a review of the record shows that the interpreter provided coherent answers that are supported by other record evidence. Further, Kidkarndee had ample opportunity during his deposition to object to the interpreter's competency and qualifications. Furthermore, Kidkarndee acknowledged he was provided an opportunity to make corrections to the deposition transcript, yet he failed to take advantage of that opportunity. Despite Kidkarndee's pro se status and limited English proficiency,

2

Auburn Correctional Facility ("Auburn").

## A. Introduction

Kidkarndee's medical record shows that on July 23, 2008 he had a heart attack, also known as a myocardial infarction. Dkt. No. 33 at 10. Since then, Auburn's cardiology department has been monitoring Kidkarndee. Kooi Decl. (Dkt. No. 32-7) ¶ 10; see, e.g., Dkt. No. 33 at 10, 125–26, 133. Kidkarndee alleged that he had a heart attack on or around September 29, 2011 and some time in March 2011. Compl. at 4. The record is devoid of any evidence indicating that Kidkarndee suffered a heart attack since 2008 or in 2011.[4] Kooi Decl. ¶ 11; see Dkt. No. 33 at 16, 57.

Kidkarndee contends that he has several other medical issues including: high blood pressure; asthma; lower back injury; damage in the upper-spine; knee damage; and sensitive wrists and arms. Compl. at 6. Kidkarndee alleged that he incurred these injuries as a Thai soldier in the 1970s. Id. In 2010, Kidkarndee had X-rays taken of his lumbar spine, cervical spine, and right knee. Kooi Decl. ¶ 26; Dkt. No. 33 at 12–15. The X-rays indicated that Kidkarndee's right knee was normal and his spine showed degenerative

---

Kidkarndee could have employed "Inmate O's" assistance to make such corrections, which he failed to do. Given the above, Kidkarndee's objection to the deposition is without merit. See Risch v. Hulihan, No. 09-CV-330, 2010 WL 5463339, at *2–3 (N.D.N.Y. Dec. 29, 2010) (denying plaintiff's request to strike his deposition from the record based on similar reasoning). Accordingly, Kidkarndee's objection to the deposition is denied and the Court proceeds to consider the deposition as record evidence.

[4] Kidkarndee testified that altogether, he has had three heart stents. Kidkarndee Dep. (Dkt. No. 32-6) at 6:22–24. A stent is a "slender rod- or threat-like device used to provide support for tubular structures . . . ." DORLAND'S ILLUSTRATED MED. DICTIONARY 1577 (28th ed. 1994) [hereinafter "DORLAND'S"].

changes; however, no treatment was required at the time. Kooi Decl. ¶ 26; Dkt. No. 33 at 12–15. Kidkarndee's medical record contains no entry indicating Kidkarndee had ever complained of wrist pain. Kooi Decl. ¶ 27. Kidkarndee's speciality care records show that he saw specialists in cardiology (Dkt. No. 33 at 125–26, 133), physical therapy (id. at 112), endocrinology (id. at 121), and optometry (id. at 35, 135). Kidkarndee takes twenty prescription pills daily for his medical conditions, in particular for pain relief, diarrhea, high blood pressure, and coronary artery disease ("CAD"). Kidkarndee Dep. (Dkt. No. 32-6) at 8:2–4, 22, 22, 9:2–5, 7–12, 24.

Kidkarndee further testified that Auburn was providing him an improper diet consisting of expired foods and foods that adversely affect his health such as tuna, to which he is allergic, and bologna, which increases his blood pressure. Kidkarndee Dep. at 21:1–12; 23:15–25. By letter dated February 20, 2012, Kidkarndee was advised he was terminated from the therapeutic diet meal program for accruing more than three unexcused absences from the diet within one week.[5] Dkt. No. 33 at 94.

_____

[5] Kidkarndee has attempted to allege an Eighth Amendment claim against prison officials based on being provided an improper diet. The intentional failure to provide an inmate with a medically prescribed diet over a prolonged period of time can constitute deliberate indifference. Davidson v. Desai, 817 F. Supp. 2d 166, 189 (W.D.N.Y. 2011) (citing Abdush–Shahid v. Coughlin, 933 F. Supp. 168, 180 (N.D.N.Y. 1996) (citing Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983)). Here, the record shows that Kidkarndee was terminated from the diet program because he missed a certain number of meals. While an issue of fact exists as to why Kidkarndee missed those meals and whether Kidkarndee was notified that unexcused absences may be cause for termination from the diet program, Kidkarndee does not indicate how he was adversely affected by the termination. Moreover, record evidence shows that Kidkarndee was returned to the program four days after the initial discontinuance. Dkt. No. 39-1 at 45–46. Given the lack of evidence indicating that Kidkarndee was harmed in any manner as well as the relatively short period of time that Kidkarndee was subjected to an improper diet, Kidkarndee has failed to establish this claim. Accordingly, Kidkarndee's potential Eighth Amendment claim based on the denial of a medically prescribed diet must fail.

4

## B. February 27, 2011 - November 7, 2011

On February 27, 2011, Kidkarndee was seen at emergency sick call for complaints of chest pain. Kooi Decl. ¶ 13; Dkt. No. 33 at 16. Kidkarndee was given nitroglycerin but because it yielded poor results, he was assessed via video at Auburn by Erie County Medical Center and then transferred to SUNY Upstate Medical Center ("Upstate Medical"). Kooi Decl. ¶ 14; Dkt. No. 33 at 16. On March 1, 2011, Kidkarndee was discharged and diagnosed with bronchitis and hypokalemia.[6] Dkt. No. 33 at 16. Upstate Medical's discharge summary indicated that Kidkarndee had two heart attacks in the past, the last one occurring four years prior, and recommended that Kidkarndee follow-up with a prison facility physician within one week. Id. at 18–19. Kidkarndee was given an antibiotic to treat bronchitis and potassium chloride to treat hypokalemia. Id. at 16, 21.

On March 25, 2011, defendant Nurse Practitioner Ryerson saw Kidkarndee for complaints of chronic diarrhea and provided medication for relief. Dkt. No. 33 at 130. On May 24, 2011, Ryerson saw Kidkarndee to confirm a cardiology appointment and have Kidkarndee sign a Contract for Specialty Care Appointment form. Ryerson Decl. (Dkt. No. 32-8) ¶ 13; Dkt. No. 33 at 31.

On June 13, 2011, non-party Cardiologist Dr. Patel followed up with Kidkarndee at Auburn. Dkt. No. 33 at 125. On July 14, 2011, Dr. Patel saw Kidkarndee and noted Kidkarndee's electrocardiogram ("EKG") was "ok." Dkt. No. 33 at 133.

On September 29, 2011, Kidkarndee was admitted to Auburn Memorial Hospital based

---

[6] Hypokalemia refers to "abnormally low potassium concentration in the blood; it may result from excessive potassium loss by the renal or the gastrointestinal route, from decreased intake, or from transcellular shifts." DORLAND'S at 807.

on complaints of chest pain.  Kooi Decl. ¶ 16; Dkt. No. 33 at 54.  Kidkarndee was diagnosed

with chest pains, CAD, hypertension, hypercholesterolemia, and adrenal insufficiency.  Kooi

Decl. ¶ 16; Dkt. No. 33 at 57.  He was transferred to Upstate Hospital for further

observation.  Kooi Decl. ¶ 17; Dkt. No. 33 at 58–59.  Upstate Hospital's discharge summary

dated October 3, 2011 indicates that Kidkarndee was diagnosed with "atypical chest pain

most likely musculoskeletal."[7]  Kooi Decl. ¶ 17; Dkt. No. 33 at 59.  Upstate Hospital directed

Kidkarndee to follow up with a cardiologist at his correctional facility within two to four weeks

and with his primary care provider within one week.  Kooi Decl. ¶ 18; Dkt. No. 33 at 60, 76.

Kidkarndee contends that on or around October 20, 2011, contrary to defendant Dr.

Kooi's assurance, Kidkarndee was denied a recommended follow-up exam at Upstate

Hospital.  Compl. ¶ 5.  Instead, Kidkarndee was sent to Oneida Correctional Facility

("Oneida") and seen by a nurse who failed to check his heart rate.  Id.

On November 7, 2011, Dr. Patel saw Kidkarndee, prescribed him medication to treat his

blood pressure, and directed him to follow up with cardiology in six months.  Kooi Decl. ¶

19; Dkt. No. 33 at 143.  On November 8, 2011, Dr. Kooi ordered the medication that Dr.

Patel prescribed.  Kooi Decl. ¶ 20; Dkt. No. 33 at 89.


### C.  January 9, 2012 - November 7, 2012

On January 9, 2012, Kidkarndee was seen at emergency sick call with complaints of

chest pain.  Kooi Decl. ¶ 21; Dkt. No. 33 at 92.  Kidkarndee had stopped taking his

---

[7]  Kidkarndee's treating physician at Auburn Memorial opined, "[a]t this time, I do
not feel that this is a cardiac chest pain.  I would suspect more of [gastrointestinal] GI
related pain."  Dkt. No. 33 at 55.

prescription medication since January 5, 2012. Kooi Decl. ¶ 21; Dkt. No. 33 at 92. An EKG was done and it showed no changes. Kooi Decl. ¶ 21; Dkt. No. 33 at 92. On January 13, 2012, Kidkarndee had a basic metabolic panel of bloodwork done as well as another EKG. Kooi Decl. ¶ 22; Dkt. No. 33 at 92.

On January 19, 2012, Ryerson saw Kidkarndee. Ryerson Decl. ¶ 14; Dkt. No. 33 at 93. Ryerson noted that an EKG conducted earlier that day indicated no changes. Ryerson Decl. ¶ 14; Dkt. No. 33 at 93. Ryerson directed Kidkarndee to have his blood pressure checked weekly and saw no need for further treatment at that time. Ryerson Decl. ¶ 14; Dkt. No. 33 at 93.

On January 20, 2012, Ryerson treated Kidkarndee's complaints of night time cough, heaviness in the chest, and vomiting. Ryerson Decl. ¶ 15; Dkt. No. 33 at 93. Ryerson noted that despite claims of vomiting, Kidkarndee's mucous membranes were moist. Ryerson Decl. ¶ 15; Dkt. No. 33 at 93. Ryerson prescribed Kidkarndee a nasal decongestant for coughs but did not see any indicated need for further treatment at that time. Ryerson Decl. ¶ 15; Dkt. No. 33 at 93.

Kidkarndee contends that by letter dated February 17, 2012, Dr. Koenigsmann denied him medical care because of his inmate status.[8] Compl. at 7. Kidkarndee contends that Dr.

---

[8] To the extent that Kidkarndee attempted to make a potential First Amendment retaliation claim or Fourteenth Amendment equal protection claim against Dr. Koenigsmann, such claims are without merit. A correspondence dated January 12, 2012 addressed to Kidkarndee from the Inmate Grievance Program Director indicates that Kidkarndee's grievance regarding medical care was pending Central Office Review Committee ("CORC") disposition. Dkt. No. 1-1 at 4. The correspondence does not suggest that the matter was referred to Dr. Koenigsmann. Another correspondence was addressed to Kidkarndee from a regional health services administrator, who advised Kidkarndee that, pursuant to Directive #4040, they do not handle grievances. Dkt. No. 1-1 at 1. There is nothing in either letter advising Kidkarndee that he was denied medical

Koenigsmann should have ordered subordinates to provide him with further medical treatment such as ordering a magnetic resonance imaging ("MRI") and blood tests. Id. at 8.

On March 19, 2012, Dr. Kooi ordered that Kidkarndee be transferred to Auburn Memorial for complaints of chest pains, where his chest pains were opined to be possibly gastrointestinal-related. Dkt. No. 33 at 105. On May 14, 2012, Dr. Patel saw Kidkarndee and ordered that Kidkarndee be scheduled for a follow up appointment in one year. Kooi Decl. ¶ 25; Dkt. No. 33 at 142.

### D. Dr. Kooi

As the Facility Health Services Director at Auburn, Dr. Kooi is responsible for determining whether an inmate requires a specialty care referral. Kooi Decl. ¶¶ 3, 8. Once an inmate is approved by DOCCS's Division of Health Services ("DHS") to see a specialist and receives treatment, Dr. Kooi defers to the treatment plan prescribed by the specialist for that specific condition. Id. ¶ 9.

Kidkarndee alleged that on multiple occasions, he sought medical attention from Dr. Kooi for the constant pain he was experiencing throughout his body. Compl. at 5. This pain was caused by the work he performed while incarcerated. Id. Kidkarndee testified that he complained to Dr. Kooi about a knee injury but Dr. Kooi opined that the knee was fine.[9] Kidkarndee Dep. at 26:8–27:5. Kidkarndee also had to have surgery in the region of his

---

treatment because of his inmate status nor is such evidence contained in the record. Accordingly, Kidkarndee's potential First and Fourteenth Amendment claims must be dismissed.

[9] Kidkarndee testified that he experiences knee pain when he uses stairs. Kidkarndee Dep. at 31:2–6.

buttocks and Dr. Kooi performed the surgery without first administering an anesthetic.  Id. at 27:23–28:10.  Kidkarndee further testified that he requested a full body MRI was denied. Id. at 29:13–30:18.  Kidkarndee further contends Dr. Kooi denied his request to see a specialist.  Compl. at 5.

Kidkarndee maintains that Dr. Kooi resented him because Dr. Kooi is Korean and during World War II, Kidkarndee's ancestors fought and won against Dr. Kooi's ancestors.[10] Compl. at 5; Kidkarndee Dep. at 32:8–33:1.  Dr. Kooi attested that he is Malaysian of Chinese descent.  Kooi Decl. ¶ 31.  Kidkarndee also reasons that Dr. Kooi denied him certain medical treatments because they are too costly.  Id. at 34:15–16.

## E.  Nurse Ryerson

Kidkarndee contends that Nurse Ryerson has the authority to review an inmate's medical records and prescribe certain treatments to alleviate pain until an inmate is

---

[10]  Liberally construing Kidkarndee's allegations, as is required by the governing law, see Subsection II(A) infra, Kidkarndee was attempting to claim that Dr. Kooi violated his First Amendment right against retaliation when Dr. Kooi denied Kidkarndee medical treatment based on racial animus.  To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that:  (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action.  Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks and citation omitted); Tafari v. McCarthy, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010).  Here, Kidkarndee fails to show any causal connection based on racial animus, particularly in part due to kidkarndee's mistaken belief that Dr. Kooi is of Korean descent.  As such, Kidkarndee's allegations also fail to satisfy a Fourteenth Amendment equal protection claim.  Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005) ("To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").  Accordingly, Kidkarndee's potential First and Fourteenth Amendment claims against Dr. Kooi must fail.

9

examined by a physician. Compl. at 6–7. However, Kidkarndee contends that Ryerson denied him medical attention on multiple occasions for asthma and pain in the lower back, upper back, knees, wrists, or arms. Id.

As a Nurse Practitioner at Auburn, Ryerson treats inmates by appointment and on an emergency basis when there is a need for an inmate to see a nurse practitioner or a medical doctor. Ryerson Decl. ¶¶ 2, 7. Ryerson was authorized to prescribe medication, refer inmates for specialty care, and create treatment plans. Id. ¶ 8. If an inmate presents a need to be referred for specialty care, Ryerson makes a referral to DHS for approval. Id. ¶¶ 9–10. Once DHS approves a referral and the inmate receives treatment, Ryerson defers to the specialist's treatment plan and any treatment plan created by Dr. Kooi. Id. ¶¶ 10–11. On all occasions that Ryerson treated Kidkarndee, no complaints were made concerning his asthma, lower back, upper back, knees, wrists, or arms. Id. ¶ 21.

### F. Dr. Koenigsmann

Kidkarndee contends that defendant Dr. Koenigsmann did not provide him the best treatment available. Koenigsmann Dep. at 13:13–15:20. Specifically, Kidkarndee wanted a new form of coronary treatment involving laser for treating his CAD. Id. Kidkarndee contends that Dr. Koenigsmann "was formally made aware of the 'seriousness' of [his] . . . medical condition(s)" by reviewing his file and determining whether to provide Kidkarndee with medical care. Compl. at 7.

As the Deputy Commissioner and Chief Medical Officer of DOCCS, Dr. Koenigsmann is responsible for the overall medical care provided to inmates. Koenigsmann Decl. (Dkt. No. 32-9) ¶¶ 2, 4. To ensure that appropriate care is provided to inmates, Dr. Koenigsmann

relies on, <u>inter</u> <u>alia</u>, primary care providers, regional medical directors, and regional health services administrators. <u>Id.</u> ¶ 4. Dr. Koenigsmann has never been Kidkarndee's personal physician and has never provided Kidkarndee's with medical treatment. <u>Id.</u> ¶ 5. Dr. Koenigsmann also has limited involvement in specialty care referrals. <u>Id.</u> ¶ 6. He reviews requests for certain types of medical procedures; however, decisions regarding specialty care services are made by an outside review agency, presumably DHS, and/or a regional medical director. <u>Id.</u>

When Dr. Koenigsmann's office receives an inmate correspondence, it is docketed on an internal correspondence tracking system and automatically assigned to a regional health services administrator for investigation and response. Koenigsmann Decl. ¶ 12. Generally, Dr. Koenigsmann generally does not see inmate correspondences addressed to him. <u>Id.</u> ¶ 13. Dr. Koenigsmann's office received letters sent by Kidkarndee to the New York State Attorney General and DOCCS's employees that are connected to this action. <u>Id.</u> ¶ 14. These letters were assigned to a regional health services administrator who responded to them on Dr. Koenigsmann's behalf. <u>Id.</u> ¶ 15; <u>see, e.g.</u>, Dkt. No. 1-1 at 1. Dr. Koenigsmann maintains he had no knowledge of these letters until the preparation of his declaration. Koenigsmann Decl. ¶¶ 14–15; <u>see, e.g.</u>, Dkt. No. 32-9 at 6–14. Dr. Koenigsmann is not involved in the inmate grievance process and has never been asked to respond to any inmate grievances.[11] Koenigsmann Decl. ¶¶ 16, 18.

---

[11] The DOCCS "IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response; and (3) appeal to the CORC [Central Office Review Committee] . . . within four working days of receipt of the superintendent's written response." <u>Abney v. McGinnis</u>, 380 F.3d 663, 668 (2d Cir. 2004) (internal citations omitted).

## II. Discussion[12]

Kidkarndee contends that: (1) defendant Dr. Kooi was deliberately indifferent to his medical conditions by denying him treatment for bodily pain, a specialty care referral, a specialist-recommended follow-up evaluation, and medical care at Oneida; (2) defendant Ryerson was deliberately indifferent to his medical conditions by denying him care; and (3) defendant Dr. Koenigsmann was deliberately indifferent to his medical conditions by refusing to provide him the best treatment available and direct subordinates to provide him with medical attention. Defendants argue that Kidkarndee's complaint should be dismissed based on lack of personal involvement and merit. In his response to defendants' motion, Kidkarndee concedes that Dr. Koenigsmann should be dismissed from this action based on the lack of his personal involvement. Dkt. No. 39 at 12.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the

---

[12] Kidkarndee sues defendants under the Sixth Amendment. Compl. at 10. Kidkarndee's Sixth Amendment right to counsel claim must be dismissed because he makes no allegations in either his pleadings or deposition to support it. Such a conclusory and unsubstantiated allegation is insufficient to withstand defendants' summary judgment motion.

case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248

(1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the

non-moving party.  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine

issue for trial.  The non-moving party must do more than merely show that there is some

doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact

could find in favor of the non-moving party for a court to grant a motion for summary

judgment.  Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223–24 (2d Cir. 1994);

Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the

non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471,

477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se
> litigant is entitled to "special solicitude," . . . that a pro se litigant's
> submissions must be construed "liberally,". . . and that such
> submissions must be read to raise the strongest arguments that
> they "suggest," . . . .  At the same time, our cases have also
> indicated that we cannot read into pro se submissions claims
> that are not "consistent" with the pro se litigant's allegations, . . .
> or arguments that the submissions themselves do not "suggest,"
> . . . that we should not "excuse frivolous or vexatious filings by
> pro se litigants," . . . and that pro se status "does not exempt a
> party from compliance with relevant rules of procedural and
> substantive law . . . ."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537

F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded

district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his

pleadings liberally.'" (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247–48.

Pursuant to this District's Local Rule 7.1(a)(3), facts set forth in a moving party's Statement of Material Facts are deemed admitted where the nonmoving party has failed to properly respond to that statement, even if the nonmoving party is proceeding pro se. Cusamano v. Sobek, 604 F. Supp. 2d 416, 426–27 (N.D.N.Y. 2009); N.D.N.Y.L.R. 7.1(a)(3).[13] As such, where a nonmovant has failed to cite record evidence in support of his denials of properly supported facts provided by defendants, such facts are admitted to the

_____

[13]  Northern District of New York Local Rule 7.1 provides in part:

> Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established.
>
> . . .
>
> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.

N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original).

14

extent they are not clearly in dispute.

## B. Personal Involvement

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d

Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus,

supervisory officials may not be held liable merely because they held a position of authority.

Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may

be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged
> constitutional violation;
>
> (2) the defendant, after being informed of the violation through a
> report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which
> unconstitutional practices occurred, or allowed the continuance
> of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of
> inmates by failing to act on information indicating that
> unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319,

323-24 (2d Cir. 1986)).[14]

---

[14]  Various courts in the Second Circuit have postulated how, if at all, the Iqbal
decision affected the five Colon factors which were traditionally used to determine
personal involvement.  Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y.
2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir.
2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's

### 1. Dr. Kooi

Defendants argue that Dr. Kooi was not personally involved with respect to Kidkarndee's claim of denied treatment at Oneida. Kidkarndee contends that Dr. Kooi denied him a follow-up evaluation and instead sent him to Oneida where its medical personnel failed to treat him. Assuming Kidkarndee was denied medical care at Oneida, this claim does not allege that Dr. Kooi directly failed to treat Kidkarndee at Oneida or was notified of Oneida's failure to treat Kidkarndee. <u>Colon</u>, 58 F.3d at 873. Kidkarndee does not allege that Dr. Kooi had created a policy that allowed for unconstitutional practices to occur at Oneida, was grossly negligent his supervision, or exhibited deliberate indifference by failing to act on information indicating that Kidkarndee was unconstitutionally denied medical care. <u>Id.</u> The record is devoid of any evidence indicating that Dr. Kooi worked at Oneida and instructed Oneida's personnel to deprive Kidkarndee of medical attention. As such, there is no genuine issue of fact showing that Dr. Kooi was personally involved in denying Kidkarndee medical care at Oneida. <u>Celotex</u>, 477 U.S. at 323.

Accordingly, defendants' motion on this ground should be granted.

### 2. Dr. Koenigsmann

Kidkarndee argues that Dr. Koenigsmann was deliberately indifferent to his medical needs by refusing him the best available treatment and direct subordinates to provide him with medical attention. Dr. Koenigsmann attested that, as a supervisor, he relies on other

---

impact on the five <u>Colon</u> factors); <u>Kleehammer v. Monroe Cnty.</u>, 743 F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third <u>Colon</u> categories pass <u>Iqbal's</u> muster . . . ."); <u>D'Olimpio v. Crisafi</u>, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that <u>Iqbal</u> eliminated <u>Colon's</u> personal involvement standard).

healthcare providers to ensure that appropriate care is provided and has never personally treated Kidkarndee. Dr. Koenigsmann also attested that while he reviews requests for specialty care referrals, he does not ultimately decide whether to provide a referral. The gravamen of Kidkarndee's complaints against Dr. Koenigsmann is that because he was in a position of power, he was always involved with anything that occurred in conjunction with his medical care at Auburn. However, an attempt to establish personal involvement based upon the supervisory role Dr. Koenigsmann occupied is inappropriate. Wright, 21 F.3d at 501 (holding that a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement).

Kidkarndee also contends that he addressed letters and grievances to Dr. Koenigsmann, who responded by denying him medical care. Kidkarndee contends that these correspondences served as notice to Dr. Koenigsmann for ongoing constitutional violations. However, merely writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. Smart v. Goord, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) ("Commissioner . . . cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] . . . ."). Similarly, receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. See, e.g., Rivera v. Fischer, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) (citing cases); Boddie v. Morgenthau, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability . . . [p]ersonal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").

17

While personnel from Dr. Koenigsmann's office responded to Kidkarndee's letters, such conduct remains insufficient to establish Dr. Koenigsmann's personal involvement in the alleged constitutional violations. This is because it is within the purview of a superior officer to delegate responsibility to others. See Vega v. Artus, 610 F. Supp. 2d 185, 198 (N.D.N.Y. 2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation.") (citing Ortiz-Rodriquez v. N.Y. State Dep't of Corr. Servs., 491 F. Supp. 2d 342, 347 (W.D.N.Y. 2007)). Furthermore, Kidkarndee does not contend that Dr. Koenigsmann created a policy or custom under which unconstitutional practices occurred. Additionally, conclusory allegations about negligent supervision and a failure to train are insufficient to establish personal involvement. Moreover, Kidkarndee concedes that Dr. Koenigsmann was not personally involved in the alleged violations and should be dismissed from this action.

Accordingly, defendants' motion on this ground should be granted.


### C.  Medical Indifference

The Eighth Amendment prohibition extends to the provision of medical care. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. Farmer v. Brennan, 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. Id. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

18

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003) (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992)).  Since there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." Brock v. Wright, 315 F.3d 158, 162–63 (2d Cir. 2003) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).  The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.

> If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition.  For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay of interruption in treatment, rather than the prisoner's underlying medical condition alone.

Lewis v. Wallace, No. 11-CV-0867 (DNH/DEP), 2013 WL 1566557, at *6 (N.D.N.Y.) adopted by, No. 11-CV-0867 (DNH/DEP), 2013 WL 1566555 (N.D.N.Y. Apr. 12, 2013) (citing Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006)) (internal quotation marks omitted).  In other words, the Court asks "whether, from an objective standpoint, the temporary deprivation was sufficiently harmful to establish a constitutional violation." Frank v. Cnty. of Ontario, 884 F. Supp. 2d 11, 19 (W.D.N.Y. 2012) (citing Smith, 316 F.3d at 186).

19

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. Chance, 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . . are not adequate grounds for a section 1983 claim." Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

In this case, Kidkarndee asserts that Dr. Koenigsmann failed to treat his CAD and Ryerson failed to treat his high blood pressure, asthma, lower back injury, damage to the upper spine and knee, as well as wrists and arms. However, Kidkarndee does not specify which physical conditions Dr. Kooi failed to treat. Assuming Kidkarndee contends that defendants failed to treat all of his medical conditions, such individual ailments do not constitute a sufficiently serious condition under the objective prong.

With regard to Kidkarndee's CAD, it is undisputed that Kidkarndee suffered a heart attack in July 2008 and continues to have a heart condition that requires ongoing monitoring and treatment. However, Kidkarndee's medical records do not indicate that he suffered another heart attack thereafter. The record shows that Kidkarndee suffered from chest pains on February 27, 2011 and September 29, 2011, both of which required hospital visitations. However, neither hospital visitation produced diagnoses of a heart attack. Rather, the February visit resulted with diagnoses of bronchitis and hypokalemia and the

September visit resulted with a diagnosis of musculoskeletal-related chest pains. While a severe heart condition can be sufficiently serious for purposes of an Eighth Amendment analysis, chest pains alone are not enough. Hutchinson v. New York State Corr. Officers, No. 02-CV-2407 (CBM), 2003 WL 22056997, a *5 (S.D.N.Y. Sept. 4, 2003) (citations omitted) (reasoning case law instructs that defendant's failure to treat chest pains does not make out an Eighth Amendment deliberate indifference claim); cf. Mandala v. Coughlin, 920 F. Supp. 342, 353 (E.D.N.Y. 1996) ("Ignoring a prisoner's complaints of chest pains where the prisoner later died of a heart attack" constitutes a serious medical need) (citing Miltier v. Beorn, 896 F.2d 848, 852–53 (4th Cir. 1990)). Thus, Kidkarndee's medical conditions involving his chest pains does not meet the objective prong.

Similarly, Kidkarndee's remaining ailments do not satisfy the objective prong of the Eighth Amendment analysis. While Kidkarndee contends that he suffers from high blood pressure, asthma, and physical pain from using stairs, the record is otherwise bereft of any details describing his pain. Kidkarndee generally described that he incurred his injuries as a Thai soldier and while working in prison; however, he does not describe when each injury occurred and when the pain began. As the Second Circuit noted, "[it is] the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." Smith v. Carpenter, 316 F.3d 178, 186–87 (2d Cir. 2003) (citing inter alia Chance, 143 F.3d 698)); see also Price v. Reilly, 697 F. Supp. 2d 344, 359–60 (E.D.N.Y. 2010) (citing the same). Furthermore, Kidkarndee failed to adduce any evidence showing that denied medical attention on Dr. Kooi's part had caused him any objectively serious harm other than the conclusory allegation that he is in "constant pain."

21

See Smith, 316 F.3d at 188–89 ("Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the [deprivation itself] . . . resulted in permanent or on-going harm to his health . . . ."). Therefore, Kidkarndee has failed to satisfy the objective prong of the Eighth Amendment analysis, rendering his Eighth Amendment claims meritless. Nevertheless, assuming Kidkarndee has satisfied the objective prong, his claims against defendants must also fail because of his failure to establish the subjective prong.

### 1. Dr. Kooi

Despite his conclusory allegations, Kidkarndee has failed to establish the subjective prong of the Eighth Amendment analysis against Dr. Kooi. Kidkarndee first contends that Dr. Kooi failed to treat him on multiple occasions concerning the constant pain he experiences throughout the body. Aside from one incident where Dr. Kooi opined that there was nothing wrong with Kidkarndee's knee, Kidkarndee does not identify which specific medical conditions Dr. Kooi knew of and intentionally denied or delayed him access to medical attention. Chance, 143 F.3d at 702; Estelle, 429. U.S. at 104. With respect to his knee, Kidkarndee does not substantiate claim with any other allegations such as when the incident occurred. "At most . . . [Kidkarndee] has shown only his personal dissatisfaction, and disagreement, with Dr. [Kooi's] diagnosis and with the care he has received." Boatwright v. Canfield, 680 F. Supp. 2d 468, 470 (W.D.N.Y. 2010) (citations omitted). This does not amount to an Eighth Amendment violation. As such, Kidkarndee's claim based on denied treatment for his physical pain must fail.

Kidkarndee contends that Dr. Kooi denied him a specialty care referral and a MRI test

in part because such care is too costly.  "Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates."  <u>Jordan v. Fischer</u>, 773 F. Supp. 2d 255, 276 (N.D.N.Y. 2011) (citing <u>Sonds</u>, 151 Supp. 2d at 311). Furthermore, a prisoner "does not have the right to treatment of his choice."  <u>Id.</u> (citing <u>Dean v. Coughlin</u>, 804 F.2d 207, 215 (2d Cir. 1986).  Here, Kidkarndee fails to identify what kind of specialist he desired and when the denial occurred.  Further, this claim amounts to nothing more than a disagreement over the need for specialists and diagnostic techniques, which is not an adequate ground for a § 1983 claim.  <u>Chance</u>, 143 F.3d at 703; <u>Sonds</u>, 151 F. Supp. 2d at 312.  Moreover, the record belies the claim involving specialty care.  Dr. Kooi did in fact referred Kidkarndee to specialty care.  Record evidence shows that Kidkarndee had seen specialists in cardiology, physical therapy, endocrinology, and optometry.  Thus, Kidkarndee's claim based on the denial of specialty care as well as an MRI test is without merit and must be dismissed.

Kidkarndee next contends that Dr. Kooi refused him a follow-up evaluation at Upstate Hospital after being discharged on October 3, 2011 and denied him treatment at Oneida. This claim cannot stand.  First, Upstate Hospital recommended a follow-up at Kidkarndee's prison facility, not at Upstate Hospital.  Second, Kidkarndee's disagreement with treatment location is a mere disagreement that is not cognizable under § 1983.  <u>Chance</u>, 143 F.3d at 703; <u>Sonds</u>, 151 F. Supp. 2d at 312.  Third, the record indicates that Kidkarndee indeed was seen by Dr. Patel in November 2011 during a follow-up evaluation.  At that evaluation, Dr. Patel ordered another follow-up with the cardiology department in six months.  Finally, Kidkarndee has failed to adduce record evidence indicating that Dr. Kooi had sent Kidkarndee to Oneida and with the knowledge that care would be denied.  <u>Estelle</u>, 429 U.S.

at 104.  As such, Kidkarndee has failed to show a genuine issue of fact with respect to Dr. Kooi's alleged deliberate indifference to his medical needs.  Celotex, 477 U.S. at 323.

Finally, Kidkarndee contends that Dr. Kooi deprived him of an anesthetic during a surgery.  However, Kidkarndee asserts this as a mere afterthought during his deposition.  Further, he does not make any allegations as to whether he experienced pain or any adverse effects from going under the surgery without being administered an anesthetic.  Moreover, assuming the deprivation constituted negligence or even medical malpractice, it "does not, without more, engender a constitutional claim." Chance, 143 F.3d at 703 (citing Estelle, 429 U.S. at 105–06).  While medical malpractice involving a physician's conscious disregard of a substantial risk of serious harm may rise to the level of deliberate indifference, there is no such evidence in the record.  Id. (citing Hathaway, 99 F.3d at 553).

Accordingly, defendants' motion on this claim should be granted.


### 2.  Nurse Ryerson

Kidkarndee has failed to show that Ryerson knew of and disregarded his serious medical needs.  Chance, 143 F.3d at 702.  Kidkarndee contends that Ryerson failed to treat his medical conditions of high blood pressure, asthma, lower back injury, damage to the upper spine and knee, as well as his sensitive wrists and arms.  However, Kidkarndee does not assert when Ryerson had denied him care for these conditions.  Conversely, the record shows that Ryerson saw and treated Kidkarndee on multiple occasions for various medical conditions, including diarrhea, cardiology-related issues, high blood pressure, coughs, and vomiting.  Further, Ryerson attested, and the medical record indicates, that Kidkarndee never complained to Ryerson about his asthma or pain in his lower back, upper back,

knees, wrists, or arms.  Given that defendants' contentions are supported by record evidence and Kidkarndee has failed to cite to record evidence in support of the contrary, Kidkarndee has failed to show a genuine issue of material of fact with respect to the subjective prong for the Eighth Amendment claim against Ryerson.

Accordingly, defendants' motion on this ground should be granted.

### 3.  Dr. Koenigsmann

Kidkarndee's Eighth Amendment claim against Dr. Koenigsmann must also fail on the merits.  Kidkarndee specifically contends that Dr. Koenigsmann denied him new medical technology that could better treat his heart problems.  As previously discussed, prison officials have wide discretion in determining the kind of medical treatment provided to an inmate and an inmate does not have a right to choose his preferred choice of treatment. Jordan, 773 F. Supp. 2d at 276 (citing Sonds, 151 Supp. 2d at 311, Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986)).  Here, Kidkarndee is not entitled to his choice of coronary treatment.  Further, this denial is not of a course of medical treatment, but rather, a different kind of treatment.  As discussed above, this amounts to nothing than a mere disagreement with treatment plans, which is not cognizable in a §1983 action.  Chance, 143 F.3d at 703; Sonds, 151 F. Supp. 2d at 312.

Accordingly, defendants' motion on this ground should be granted.

### III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 32) be **GRANTED** and Kidkarndee's complaint (Dkt. No. 1) be

**DISMISSED** as to all claims and all defendants.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation."  N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  <u>Roldan v. Racette</u>, 984 F.2d 85, 89 (2d Cir. 1993); <u>Small v. Sec'y of HHS</u>, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: September 23, 2013
        Albany, New York

Christian F. Hummel
U.S. Magistrate Judge